O

JS - 6

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

M.S., a minor, by and through her
Guardian Ad Litem, PEGGY SARTIN.

            Plaintiff,

  vs.

LAKE ELSINORE UNIFIED SCHOOL
DISTRICT,

           Defendants.

_____

Case No. 13-CV-01484-CAS (SPx)

**MEMORANDUM AND ORDER ON
APPEAL FROM
ADMINISTRATIVE LAW JUDGE'S
DECISION**

## I.    INTRODUCTION

This case arises under the Individuals with Disabilities Education Act (the "IDEA"), 20 U.S.C. §§ 1400 et seq.  On August 26, 2013, plaintiff M.S., a minor, by and through her Guardian Ad Litem, Peggy Sartin (collectively, "Student"), filed suit against defendant Lake Elsinore Unified School District ("District"), seeking reversal of the Administrative Law Judge's ("ALJ") May 22, 2013 decision, which found for District on all of Student's claims.

Presently before the Court is Student's administrative appeal.  A hearing was held on January 21, 2015.  The parties present the following primary issues for determination: (1) Whether District properly assessed and identified Student's

suspected disabilities in behavior, anxiety, and sensory integration; (2) Whether District provided services sufficient to allow Student to make academic progress; (3) Whether District violated the IDEA by holding an individualized education plan meeting in the absence of Student's parents; (4) Whether Student is entitled to reimbursement for services provided by Dr. Robin Morris; and (5) Whether Student is entitled to compensatory education.[1]  Having carefully considered the parties' arguments, the Court finds and concludes as follows.

## II.    STATUTORY FRAMEWORK

The IDEA grants federal funds to state and local agencies to provide a special education to children with disabilities.  20 U.S.C. § 1412(a);  Ojai Unified Sch. Dist. v. Jackson, 4 F.3d 1467, 1469 (9th Cir. 1993).  To this end, schools are charged with the responsibility of identifying and assessing all children who are suspected to have disabilities and are in need of special education and related services.  20 U.S.C. § 1400(a)(3); 34 C.F.R. § 300.125; Cal. Educ. Code § 56302.

The purpose of the IDEA is, among other things, to provide all children with disabilities

> a free appropriate public education [("FAPE")] that emphasizes special education and related services designed to meet their unique needs and prepare them for employment and independent living; [] to ensure that the rights of children with disabilities and parents of such children are protected; [] and to assist States, localities, educational services agencies, and Federal agencies to provide for the education of all children with disabilities.

20 U.S.C. § 1400(d)(1)(A)-(C).  This purpose is implemented through the development of an individualized education plan ("IEP").  An IEP is crafted by a team that includes a student's parents, teachers, and the local educational agency.  20 U.S.C. § 1414(d).  The

---

[1] Student also raised other issues at the administrative hearing, including whether District failed to develop individualized education plan (IEP) goals that were measurable, appropriate, and unambiguous.  However, Student failed to address these in her opening brief and at the hearing.  As such, the Court does not consider them.  See Officers for Justice v. Civil Service Com'n of City and Cnty. of San Francisco, 979 F.2d 721, 726 (9th Cir. 1992) (refusing to address issues not raised in appellant's opening brief).

IEP contains the student's present level of performance, annual goals, short and long term objectives, specific services to be provided, the extent to which the student may participate in regular educational programs, and criteria for measuring the student's progress. Id.

The IDEA requires that educators also guarantee certain procedural safeguards to children and their parents, including: notification of any changes in identification, education and placement of the student; parental presence at the IEP meeting; and a mechanism for parents to bring complaints about issues relating to the student's education and placement, which may result in a mediation or a due process hearing conducted by a local or state educational agency hearing officer. 20 U.S.C. § 1415(b)-(i).

A party may bring a civil action in state or federal court in the event that it is dissatisfied with the decision of an agency hearing officer. 20 U.S.C. § 1415(i)(2). "The burden of proof in the district court rest[s] with . . . the party challenging the administrative decision." Hood v. Encinitas Union Sch. Dist., 486 F.3d 1099, 1104 (9th Cir. 2007). The court, in considering a request for review of a hearing officer's decision, must base its decision on the preponderance of the evidence, and grant such relief as the court determines is appropriate. Id.

## III. FACTUAL BACKGROUND

The decision below contains detailed and thorough factual findings. See AR 351-378. The Court concludes that the factual findings in the decision below are accurate, and adopts them as they are set out. Additionally, since the factual findings encompass matters no longer pursued in this appeal, and to provide context for the Court's decision, the Court summarizes the relevant facts.

Student is a thirteen-year old girl with autism. As a result of her disability, she suffers from deficits in communication, sensory integration, cognitive development, academic functioning, social interaction, anxiety, focus, attention, and behavior. From January 2011 through about June 2012, Student attended Cottonwood Elementary

School within the District, where she was placed in an alternative education program pursuant to a settlement agreement between Student and District covering claims arising before 2011.  As part of the program, Student was placed in a small class with other special education students, a special education teacher, and a one-to-one support aide provided by the Center for Autism and Related Disorders ("CARD").

Between June 8, 2010 and August 12, 2010, Dr. Robert Patterson conducted a psychoeducational independent educational evaluation ("IEE") of Student at District's expense.  He observed that Student exhibited significant autism-related behaviors, including sitting on the toilet with her pants on, dunking herself in toilet water, pulling out her eyelashes, punching herself, and other impulse control issues.  As Allison Mativa, Student's teacher, also noted, many of Student's behaviors were cyclical in that they would disappear for a time and reoccur later.  In the meantime, when one behavior disappeared, another took its place.  This pattern continued beyond Dr. Patterson's 2010 IEE and throughout Student's time at Cottonwood.

In April 2011, also pursuant to the settlement agreement, District referred Student to Gallagher Pediatric Therapy ("Gallagher") for an occupational therapy evaluation. Gallagher administered several tests, including the Bruininks-Oseretsky Test of Motor Proficiency, Second Edition.  Gallagher also provided Student's parents ("Parents") and teacher with a Sensory Profile questionnaire designed to measure Student's sensory processing abilities.  The version of the questionnaire completed by Parents indicated that Student exhibited a score of "definite difference" from the norm, while the version completed by Student's teacher found that Student exhibited a score of "typical performance."

Finally, in May 2011, District paid for an IEE in speech and language with Lynda Detweiler-Newcomb.  Detweiler-Newcomb administered several formal tests, observed Student, interviewed Parents, and reviewed records related to Student's disabilities.  In her report, Detweiler-Newcomb concluded that while Student's hearing was within

/ / /

normal limits, she was deficient in sound production development, receptive language skills, vocabulary, and verbal and written language skills.

### A.    The May 9, 2011 IEP and September 19, 2011 Addendum

On May 9, 2011, the parties held an annual IEP meeting.  All statutorily required persons attended, as well as a CARD supervisor, an occupational therapist, and a speech and language pathologist.  At the meeting, it was determined that Student met two goals from her 2010 IEP, partially met eleven, and failed to meet eight.  The eight goals Student did not meet were in academic areas such as writing, math, and reading.  While the IEP team amended certain goals for 2011, it adopted others verbatim from the 2010 IEP.  Parents objected to the IEP on the grounds that merely carrying over some goals was improper and, in any event, the goals were premised on overstated present levels of performance.

As to Student's behavior, Mativa indicated that in her opinion, Student "appeared to enjoy attending school and interacting with her peers.  She has transition[ed] very well into the new classroom placement."  Although Student sometimes exhibited certain maladaptive behaviors, Mativa and other teachers classified such behavior as merely attention-seeking.

Parents, however, disagreed.  They contended that Cottonwood's alternative program was too difficult for Student academically and that her classmates' behavior was impeding Student's education.  Specifically, Parents argued that Student imitated the yelling of obscenities as well as other violent behavior exhibited by her peers.  According to Parents, Student had become more aggressive at home and with tutors, sometimes attacking strangers in public.  Student had also begun ripping off her toenails and fingernails.  Consequently, Parents requested that Student be placed at the Beacon School ("Beacon"), a small, non-public school that specializes in educating autistic children.  District formally denied the request on July 14, 2011, stating that it believed Cottonwood was appropriate for Student.

/ / /

On September 19, 2011, the IEP team met again to discuss Parents' request for placement at Beacon, as well as CARD behavior goals that were not introduced at the original IEP meeting in May.  Parents consented to inclusion of the CARD goals.  However, Parents reiterated that Student's behavior had progressively worsened since beginning the Cottonwood alternative program in January: Student had pulled out all of her eyelashes, had created a one-inch bald spot on her scalp from pulling out her own hair, manipulated her fingers, and violently scratched, pinched, and grabbed people's necks.  On October 3, 2011, District again denied Parents' request for placement at Beacon.

**B.**    **The May 8, 2012 IEP**

On May 8, 2012, the IEP team met to discuss goals for the 2012-2013 school year.  Of the eleven reported goals from 2011, Student had met six, partially met four, and failed to meet one.  Student's teachers and CARD aides indicated that they believed Student had progressed academically and behaviorally from the last IEP.  They claimed that Student was working at a second grade level and required minimal prompting in completing tasks.  Parents disagreed, arguing that Student often communicated in only one or two words, and could not even write a sentence without major prompting.  Parents further noted that Student exhibited significant echolalia and perseveration,[2] and had developed other troubling behavior such as swiping objects off tables, then breaking the objects and screaming.  Student's CARD aide agreed that in May 2012, Student was forming new, inappropriate behaviors, the frequency of which was increasing.

The IEP team created nineteen goals for the 2012-2013 school year.  Parents again objected to all goals, save for those proposed by CARD, on the grounds that the goals were premised on overstated present levels of performance.  Also, since Student

[2] Perseveration is the inappropriate repetition of behavior or speech; echolalia is the inappropriate and automatic repetition of another person's words and sounds.

would be entering middle school and thus could not remain at Cottonwood, the District made a formal offer of placement in the alternative program at Canyon Lake Middle School ("Canyon Lake"), another school within the District.  Although the Canyon Lake program was non-existent at the time of the offer, District officials designed it to function as merely an extension of the Cottonwood program.

### C.     The July 31, 2012 IEP Addendum

On June 12, 2012, Parents provided District with notice that they intended to enroll Student in Beacon and expected District to cover the costs.  On June 20, 2012, District requested an IEP addendum meeting to discuss the unilateral placement; it proposed three dates from which Parents could choose.  On July 9, 2012, Parents responded that none of the proffered dates were acceptable, and they expressly withheld their consent to holding an IEP meeting without their presence.  On July 12, 2012, District replied by noting that a meeting was mandatory and, absent a suggestion from Parents as to a day and time, it would be held in their absence on July 20, 2012.  Parents did not respond, and District made no further effort to contact them.  The meeting ultimately took place on July 31, 2012.  District did not communicate to Parents the fact that the date was changed from July 20, 2012.  Needless to say, Parents were not present at the July 31 addendum meeting.

At the addendum meeting, the IEP team determined that Student's aggressive behaviors were increasing, and that the behavioral approaches included in the May 8, 2012 IEP were ineffective.  District recommended a Functional Analysis Assessment by someone other than CARD, after which the IEP team would meet to discuss additional behavioral supports.  District sent Parents a copy of the IEP Addendum, to which Parents did not respond.

### D.     Dr. Robin Morris's IEE

Parents sought an independent assessment from Dr. Robin Morris in May 2012.  Dr. Morris holds a master's degree in clinical psychology, a doctorate in psychology, and a graduate academic certification in applied behavior analysis (G.A.C.T.A.B.A.).

She works primarily with children with autism, and provides individual therapy and neurological and psychological assessments.

As part of her IEE, Dr. Morris interviewed Student's teachers and CARD aide, reviewed Dr. Patterson's evaluation and Student's 2012 IEP, and observed Student at school and in her office. Dr. Morris concluded that Student was suffering from high levels of stress and anxiety, and that Student's behaviors were presenting larger safety issues than they had before. For instance, Student had begun choking herself by putting large objects in her mouth, grinding her teeth furiously, and tensing her body to the point of trembling. Dr. Morris also noted that Student was significantly more aggressive. In particular, during Dr. Morris's assessment, Student flipped an entire table on Dr. Morris, knocking Dr. Morris to the floor. Student also tore her own shirt off within minutes of beginning the assessment, such that she was entirely naked on her upper body. Academically, Dr. Morris found lack of progress in some areas and made a series of recommendations related thereto.

Furthermore, Dr. Morris seconded Parents' arguments that the IEP was inadequate. She challenged the present levels of performance on which the IEP goals were based, and suggested more goals dealing with social interaction, self-direction, and integrated play. She also expressed her belief that Student's behaviors have multi-faceted antecedents, and are not just attention-seeking, as CARD and Student's teachers had determined.

### E.    Canyon Lakes and Beacon

After District offered Student a placement at Canyon Lake for middle school, Parents and Dr. Morris toured the campus. As discussed above, at the time of the District's offer during the May 2012 IEP meeting, and at the time of the tour, Canyon Lakes's alternative program was in its design phase. No classroom had been set up, and no teacher had been hired. However, District officials involved in the creation of the program stressed that it was to be merely an extension of the Cottonwood program, and

Parents do not dispute that this is how the Canyon Lake program was ultimately implemented.

Beacon, on the other hand, is an award-winning school in La Palma, California serving autistic children and young adults through age twenty-two. The school retains a psychologist, behavior analyst, and neuropsychologist on staff. All aides are trained behavior interventionists, and all teachers have special education credentials.

## IV. ADMINISTRATIVE PROCEEDINGS

On August 14, 2012, Student initiated a due process hearing before the Office of Administrative Hearings ("OAH"). She alleged that District failed to provide her with a FAPE from January 25, 2011 through December 13, 2012, in violation of the IDEA. The specific issues before the ALJ were as follows:

1. Did the District fail to provide Student a FAPE by failing to identify all areas of disability or suspected disability between January 25, 2011 and December 13, 2012?

2. Did the District fail to develop IEP goals for Student between January 25, 2011 and December 13, 2012, which were not vague, measurable, and appropriate for Student?

3. Did the District fail to offer Student a FAPE during but not limited to the 2012-2013 school year, including the 2012 extended school year (ESY), by failing to offer Student an appropriate combination of direct instructional services and classroom setting?

4. Did the District fail to offer appropriate ESY services between January 25, 2011 and December 2012?

5. Is Student entitled to reimbursement for an IEE provided by Dr. Morris as well as her subsequent observations?

6. Is Student entitled to compensatory education as a result of the District's failure to provide Student with appropriate services for the period of January 25, 2011 through December 13, 2012?

A hearing was held on February 19-21, 27-28, and March 4-5, 2013.  On May 22, 2013, the ALJ issued her decision in favor of District on all issues.  Specifically, the ALJ found that Dr. Patterson's initial assessment in 2010 sufficed to identify all areas of suspected disability, that District provided appropriate services as evidenced by Student's progression academically and behaviorally, and, as such, Student is not entitled to a reimbursement for either Dr. Morris's IEE or Beacon tuition.

## V.     STANDARD OF REVIEW

The standard of review applicable to IDEA administrative proceedings is established by the statute itself.  The IDEA provides that in evaluating an administrative decision, the Court: "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."  20 U.S.C. § 1415(i)(2)(C); see Ojai, 4 F.3d at 1471-72 (9th Cir. 1993).

The Court reviews de novo the appropriateness of a special education placement under the IDEA.  Seattle Sch. Dist. No. 1 v. B.S., 82 F.3d 1493, 1499 (9th Cir. 1996); Livingston Sch. Dist. Nos. 4 & 1 v. Keenan, 82 F.3d 912, 915 (9th Cir. 1996).  Despite the de novo standard of review, however, the Court is required to give due weight to the hearing officer's administrative findings and appropriate deference to the policy decisions of school administrators.  The Ninth Circuit has articulated the deference to be given to the administrative findings as follows:

> The court reviews de novo the appropriateness of a special education placement under the IDEA.  Nevertheless, when reviewing state administrative decisions, courts must give due weight to judgments of education policy.  Therefore, the IDEA does not empower courts to substitute their own notions of sound educational policy for those of the school authorities which they review.  Rather, the court in recognition of the expertise of the administrative agency, must consider the findings carefully and endeavor to respond to the hearing officer's resolution of each material issue.  After such consideration, the court is free to accept or reject the findings in part or in whole.  Despite their discretion to reject the administrative findings after carefully considering them, however, courts are not permitted simply to ignore the administrative findings.

Cnty. of San Diego v. California Special Educ. Hearing Office, 93 F.3d 1458, 1466 (9th Cir. 1996) (internal citations and quotations omitted); see also Board of Educ. of the

Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley, 458 U.S. 176, 206 (1982).  A court may, in its discretion, choose to accord greater deference to a hearing officer's findings when those findings are thorough and careful.  Capistrano Unified Sch. Dist. v. Wartenberg, 59 F.3d 884, 891 (9th Cir. 1995).  A court may "treat a hearing officer's findings as thorough and careful when the officer participates in the questioning of witnesses and writes a decision containing a complete factual background as well as a discrete analysis supporting the ultimate conclusions." R.B. v. Nappa Valley Unified Sch. Dist., 496 F.3d 932, 942 (9th Cir. 2007); Park v. Anaheim Unified High Sch. Dist., 464 F.3d 1025, 1031 (9th Cir. 2006).  Nonetheless, "at bottom, the court itself is free to determine independently how much weight to give the administrative findings in light of the enumerated factors." Cnty. of San Diego, 93 F.3d at 1466.

In this case, the administrative hearing lasted eight days and the ALJ's fifty-five page decision contains a detailed factual analysis.  Moreover, the ALJ's pertinent factual findings are not disputed.  Therefore, the Court will give the ALJ's factual findings deference and review the legal conclusions *de novo*.  Id.

## VI.   DISCUSSION

### A.   Whether District Properly Assessed Student in All Areas of Disability

In conducting an evaluation of a student with a suspected disability, the IDEA provides that the District shall:

> (A) use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information, including information provided by the parent . . .
>
>                    * * *
>
> (B) not use any single measure or assessment as the sole criterion . . . for determining an appropriate educational program for the child.

20 U.S.C. § 1414(b)(2)(A)-(B); see also Cal. Educ. Code § 56320 (providing that "no single measure or assessment is used as the sole criterion for determining an appropriate

/ / /

11

educational program for the pupil."); <u>Jack B. v. Council Rock Sch. Dist.</u>, 2008 WL 4489793, at *8 (E.D. Pa. Oct. 3, 2008).

In a one-paragraph analysis, the ALJ dismissed Student's contention that District failed to assess and/or identify all of Student's disabilities, noting that Dr. Patterson's assessment properly focused on all areas of suspected disability, including behavior, anxiety, and sensory integration.  District's contentions closely follow the ALJ's analysis.  District argues that in addition to Dr. Patterson's assessment in 2010, CARD evaluated Student's behaviors on an ongoing basis, and a behavior intervention plan was in place to address them.  As to anxiety, District claims it continually reassessed Student's needs by providing access to sensory tools, regular breaks, and a support aide, among other things.  Finally, District contends that it assessed Student in sensory integration through Gallagher and the accompanying Sensory Profile questionnaire.

Student does not contend that Dr. Patterson's initial assessment insufficiently addressed and identified Student's areas of disability *at the time of the assessment* in August 2010.  Nevertheless, the question remains whether District was required to reassess Student during the period at issue in light of new and worsening behaviors. Typically, District must reassess Student at least once every three years, but no more than once per year absent an agreement by Parents and District to the contrary.  20 U.S.C. § 1414(a)(2)(B); <u>J.W. ex rel. J.E.W. v. Fresno Unified Sch. Dist.</u>, 611 F. Supp. 2d 1097, 1111 (E.D. Cal. 2009) <u>aff'd</u>, 626 F.3d 431 (9th Cir. 2010).  A reevaluation occurs "if the local educational agency determines that the educational or related service needs, including improved academic achievement and functional performance, of the child warrant a reevaluation . . . or if the child's parents or teacher requests a reevaluation."  20 U.S.C. § 1414(a)(2)(A); Cal. Educ. Code § 56381(a).

### 1.    Behavior

Dr. Patterson's assessment, which included behavior, was reported in August 2010.  Thus, District was required to reassess Student's behavior no later than August 2013, but could have conducted a reassessment as early as August 2011, if Parents so

requested.  20 U.S.C. § 1414(a)(2)(A)-(B); Cal. Educ. Code § 56381(a).  Parents made such a request on numerous occasions, including at the September 2011 IEP addendum meeting.  District argues that CARD's support services functioned as a continual and daily informal assessment, and thus, District assessed Student's behavior within the statutory time frame.  CARD's purported assessment was based on Michelle Martinez's ("Martinez") observations as Student's in-class aide, as well as data she collected on the frequency of Student's maladaptive behavior.  No formal tests were administered.

The Court finds that District did not assess Student's behavior within the meaning of the IDEA.  First, District itself acknowledges that its "last assessments were completed in 2010."  Opp'n at 24.  Second, data collected through observation and observation itself are essentially one and the same, and do not suffice to meet the statutory requirement that District use  "*a variety* of assessment tools and strategies."  20 U.S.C. 1414(b)(2)(A) (emphasis added); <u>W.H. ex rel. B.H. v. Clovis Unified Sch. Dist.</u>, 2009 WL 1605356, at *18 (E.D. Cal. June 8, 2009) (suggesting that more than mere observation is required for an assessment); <u>Jack B.</u>, 2008 WL 4489793, at *8 (finding an assessment that used at least three different formal instruments adequate).  Third, Martinez holds a master's degree in human behavior, and although she is currently seeking her board certification in behavior analysis, the record contains no indication that she is qualified to identify behavioral antecedents.  <u>See</u> Cal. Educ. Code § 56320(g) (requiring an assessment to be conducted by persons knowledgeable about that disability).  In fact, Martinez characterized Student's behaviors as merely attention seeking, an assertion which District itself acknowledged was incorrect in the 2012 IEP.

Finally, there is ample reason to believe that Student's behaviors had become progressively more aggressive and posed a threat to her health and safety, warranting a new assessment.  <u>See</u> 20 U.S.C. § 1414(a)(2)(A).  At the 2011 IEP, Parents expressed their concern that Student had become more aggressive at home and with tutors, and that she sometimes attacked strangers in public.  She had also begun ripping off her toenails and fingernails, had a one-inch bald spot on her scalp from pulling out her own

hair, manipulated her fingers, and violently scratched, pinched, and grabbed people's necks.  She also screamed and cursed at random intervals.  At the May 2012 IEP, Parents further noted that Student exhibited significant echolalia and perseveration, and had developed other troubling behavior such as swiping objects off the table and breaking them.  Martinez agreed that Student was forming new, inappropriate behaviors, the frequency of which was increasing.  Counsel for District also conceded as much at oral argument.  Student's aggressive behavior is perhaps best demonstrated by her violent interaction with Dr. Morris in May 2012.  Furthermore, at the July 2012 IEP addendum meeting, District concluded that Student's behaviors had worsened and were not being addressed sufficiently by the behavior plan that had been in place up until that time.  In light of the foregoing, District failed to assess Student's behavior during the time period at issue.

District's failure to assess Student's behavior constitutes a procedural violation of the IDEA.  R.B., ex rel. F.B.v. Napa Valley Unified Sch. Dist., 496 F.3d 932, 940 (9th Cir. 2007) ("we have, more often than not, held that an IDEA procedural violation denied the child a FAPE.").  A procedural violation of the IDEA constitutes a denial of a FAPE "only if the violation: (1) impeded the child's right to a FAPE; (2) significantly impeded the parent's opportunity to participate in the decisionmaking process; or (3) caused a deprivation of educational benefits." W.H. ex rel. B.H., 2009 WL 1605356, at *18; see also 20 U.S.C. § 1415(f)(3)(E)(ii); Cal. Educ. Code § 56505(f)(2); W.G. v. Bd. of Trustees of Target Range Sch. Dist. No. 23, Missoula, Mont., 960 F.2d 1479, 1484 (9th Cir. 1992).  Here, Student's maladaptive behaviors resulted in her removal from the classroom on many occasions, thereby causing her to miss instruction or services.  Martinez also testified that Student's behaviors interfered with Student's ability to learn and access information.  Therefore, the District's failure to assess Student in behavior deprived her of educational benefits, and, accordingly, District denied Student a FAPE on that basis. See Carrie I. ex rel. Greg I. v. Dep't of Educ., Hawaii, 869 F. Supp. 2d

1225, 1247 (D. Haw. 2012) ("The lack of assessments alone is enough to constitute a lost educational opportunity.").

### 2.     Anxiety

District argues that it recognized anxiety as one of Student's issues and provided her with supports such as a small classroom, regular breaks, and the support of an aide. However, providing a student with services intended to ameliorate the symptoms of a disability is typically a *response* to an assessment, not an actual assessment.  See W.H. ex rel. B.H., 2009 WL 1605356, at *18.  To the extent the services provided were based on teacher observations and their judgment about the antecedents and proper treatments for Student's anxiety, District improperly assessed Student using only a "single measure . . . for determining an appropriate educational program for the child."  20 U.S.C. § 1414(b)(2)(B).  Accordingly, District failed to assess Student in anxiety, and for the same reasons addressed in connection with behavior, denied Student a FAPE on that basis.

### 3.     Sensory Integration

In referring Student for an IEE with Gallagher in April 2011, District sufficiently assessed Student in sensory integration using a variety of different tools.  20 U.S.C. § 1414(b)(2)(A).  Gallagher administered several formal tests, including the Bruininks-Oseretsky Test of Motor Proficiency, Second Edition.  Gallagher also provided Parents and her teacher with a Sensory Profile questionnaire that was designed to measure Student's sensory processing abilities.  Jack B., 2008 WL 4489793, at *8 (finding the use of several formal tests to be sufficient).  Student was also the subject of observation by Kristine Penwarden, District's occupational therapist, who made certain recommendations for addressing Student's sensory needs.  Accordingly, District assessed Student in sensory integration.

/ / /

/ / /

/ / /

**B.**     **Whether District Provided Services That Allowed Student to Make Academic Progress**

The IDEA requires that IEPs be "reasonably calculated to enable the child to receive educational benefits[.]" <u>Rowley</u>, 458 U.S. at 207.  School districts must provide disabled students with specialized instruction such that students are afforded a basic floor of opportunity and receive at least "some educational benefit" from such instruction.  <u>J.L. v. Mercer Island Sch. Dist.</u>, 592 F.3d 938, 951 (9th Cir. 2010).  Districts are not required, however, to provide a potential-maximizing education.  <u>Rowley</u>, 458 U.S. at 197 n. 21.  Moreover, "no single substantive standard can describe how much educational benefit is sufficient to satisfy the Act. Instead, the Supreme Court left that matter to the courts for case-by-case determination."  <u>Hall by Hall v. Vance Cnty. Bd. of Educ.</u>, 774 F.2d 629, 635 (4th Cir. 1985).

In this case, only Parents and Dr. Morris allege that Student regressed academically.  In contrast, every one of Student's educators testified that she had in fact progressed.  For instance, in October 2011, Student was performing at a kindergarten level; by June 2012, she was performing at the level of a second grader.  Student's communication abilities also increased between 2011 and 2012.  Although Dr. Morris's assertions are given due weight, doctors often are not "in a better position to judge a student's progress than a teacher who has spent hours with the student every day for a whole school year."  <u>M.P. ex rel. Perusse v. Poway Unified Sch. Dist.</u>, 2010 WL 2735759, at *8 (S.D. Cal. July 12, 2010).  While it is true that Student failed to meet many of her academic goals in the 2011 IEP, the situation was vastly different in the 2012 IEP, where Student failed to meet or partially meet only a single goal.  Indeed, Student improved academically between 2011 to 2012 notwithstanding Parents' belief that Student's goals were based on overstated levels of performance, which, if true, would render meeting goals *harder* rather than easier.  Accordingly, the Court agrees with the ALJ that the weight of the evidence supports the conclusion that Student

/ / /

received "some educational benefit" from her instruction at Cottonwood.  <u>J.L.</u>, 592 F.3d at 951.

## C.     Whether District Denied Student a FAPE by Holding an IEP Meeting Without Parents

In a single sentence, the ALJ concluded that Parents had an opportunity to attend the July 2012 IEP meeting, and Student was therefore not denied a FAPE.  The Court disagrees.

The IDEA contains certain procedural safeguards, "the importance of which 'cannot be gainsaid.' "  <u>Amanda J. ex rel. Annette J. v. Clark Cnty. Sch. Dist.</u>, 267 F.3d 877, 891 (9th Cir. 2001) (quoting <u>Rowley</u>, 458 U.S. at 205).  Chief among these protections is the requirement that parents be involved in the development of their child's educational plan, since "[n]ot only will parents fight for what is in their child's best interests, but because they observe their children in a multitude of different situations, they have a unique perspective of their child's special needs."  <u>Amanda J. ex rel. Annette J.</u>, 267 F.3d at 891.  As the Supreme Court noted:

> It seems to us no exaggeration to say that Congress placed every bit as much emphasis upon compliance with procedures giving parents and guardians a large measure of participation at every stage of the administrative process, as it did upon the measurement of the resulting IEP against a substantive standard.  We think that the congressional emphasis upon full participation of concerned parties throughout the development of the IEP . . . demonstrates the legislative conviction that adequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP.  <u>Rowley</u>, 458 U.S. at 205-06.

"Procedural violations that interfere with parental participation in the IEP formulation process undermine the very essence of the IDEA.  An IEP which addresses the unique needs of the child cannot be developed if those people who are most familiar with the child's needs are not involved or fully informed."  <u>Amanda J. ex rel. Annette J.</u>, 267 F.3d at 892.

Given this emphasis on parental involvement, the IDEA requires that the IEP team include at least one parent.  20 U.S.C. § 1414(d)(1)(B); Cal. Educ. Code § 56341.5(a).  Although District may hold a meeting in Parents' absence should they

decline to attend, the statute contemplates that District expend more effort to secure Parents' presence than the effort expended here.  For instance, District is required to maintain records of its attempts to secure Parent's attendance, including (1) detailed records of telephone calls made or attempted and the results of those calls; (2) copies of correspondence sent to the parents or guardians and any responses received; and (3) detailed records of visits made to the home or place of employment of the parent or guardian and the results of those visits.  Cal. Educ. Code § 56341.5(h).  In this case, District made no effort beyond sending an email to Parents suggesting a few dates for the IEP meeting.  Even if Parents acted unreasonably by failing to suggest dates of their own, District is not thereby excused for ultimately holding the meeting in Parents' absence.  Indeed, the IEP team met on July 31, 2012—*not* July 20, 2012—as District had informed Parents through their initial email, undermining the ALJ's conclusion that Parents had an opportunity to attend.  District made no attempt whatsoever to notify Parents that the date for the meeting had been switched, in clear violation of the statutory requirement that "[p]arents or guardians shall be notified of the individualized education program meeting early enough to ensure an opportunity to attend."  Cal. Educ. Code § 56341.5(b).  Therefore, District procedurally violated the IDEA by holding the July 2012 IEP addendum meeting without Parents.

As noted above, a procedural violation of the IDEA constitutes a denial of a FAPE "when the violation results in the loss of educational opportunity or seriously infringes the parents' opportunity to participate in the IEP formation process."  R.B., ex rel. F.B., 496 F.3d at 938 (internal quotations omitted); see also 20 U.S.C. § 1415(f)(3)(E)(ii); Cal. Educ. Code § 56505(f)(2); Target Range, 960 F.2d at 1484; W.H. ex rel. B.H., 2009 WL 1605356, at *18.  By not apprising Parents of the new date for the meeting—a meeting which resulted in significant changes to the IEP—District effectively precluded their attendance and "infringe[d] [] [P]arents' opportunity to participate in the IEP formation process."  R.B., ex rel. F.B., 496 F.3d at 938; Target Range, 960 F.2d at 1485 (holding that the school's failure to include the child's parents

in the IEP denied the child a FAPE).  This is especially true given District's own contention that Parents were active participants in every other IEP, and since District knew Parents were intimately involved in their child's education.  Accordingly, District denied Student a FAPE by failing to include Parents in the July 31, 2012 IEP meeting.

> **D.    Whether Student is Entitled to Reimbursement for Services Provided by Dr. Morris**

The ALJ found that Dr. Patterson's assessment in August 2010 was itself an IEE, and Student is not entitled to an IEE for an IEE.  As such, the ALJ concluded that Student is not entitled to reimbursement for Dr. Morris's services.  The ALJ did not reach the issue of whether CARD's informal daily assessments sufficed to meet the statutory requirements for an assessment.  However, as discussed above, Student was statutorily entitled to a reassessment as often as once per year upon Parents' request—regardless of whether Dr. Patterson's evaluation was an IEE.  Despite numerous requests, District did not fund such an assessment within the requisite time frame, nor were CARD's informal observations adequate.

"A parent or guardian has the right to obtain, at public expense, an independent educational assessment of the pupil from qualified specialists . . . if the parent or guardian disagrees with an assessment obtained by the public education agency."  Cal. Educ. Code § 56329(b); 34 C.F.R. § 300.502(b)(1).  If a parent requests an IEE, District must either fund the IEE or initiate a due process hearing to show that its own assessment was appropriate.  Cal. Educ. Code § 56329(c); 34 C.F.R. § 300.502(b)(2)(i).  "Failure to act on a request for an independent evaluation is certainly not a mere procedural inadequacy; indeed, such inaction jeopardizes the whole of Congress' objectives in enacting the IDEA."  Harris v. D.C., 561 F. Supp. 2d 63, 69 (D.D.C. 2008).

District argues that, because there was no assessment of Student after Dr. Patterson's 2010 assessment, there is no assessment within the statute of limitations with which Parents can disagree, and thus no IEE is required.  This position is notably

inconsistent with District's argument throughout the rest of its brief—specifically, that District continually assessed Student by way of CARD and teacher observations. Nonetheless, District contends that even if it did assess Student, the assessments were themselves IEEs, echoing the ALJ's conclusion that Student is not entitled to an IEE for an IEE.

The Court, having concluded that District did not assess Student in her areas of need, notes that Student has "no statutory right to public reimbursement of [Dr. Morris's] assessment." Los Angeles Unified Sch. Dist. v. D.L., 548 F. Supp. 2d 815, 821 (C.D. Cal. 2008).[3] However, this Court "has the power to grant such relief as it determines is appropriate." Parents of Student W. v. Puyallup Sch. Dist., No. 3, 31 F.3d 1489, 1496 (9th Cir. 1994) (internal quotations omitted). "Equitable considerations are relevant in fashioning relief." Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass., 471 U.S. 359, 374 (1985). Further, "[a] parent has an equitable right to reimbursement when a school district has failed to provide a free appropriate public education." D.L., 548 F. Supp. 2d at 822; Target Range, 960 F.2d at 1486. Other courts faced with similar fact patterns have ordered reimbursement of IEEs. See, e.g., Jefferson Cnty. Bd. of Educ. v. Lolita S., 977 F. Supp. 2d 1091, 1126 (N.D. Ala. 2013) aff'd, 581 F. App'x 760 (11th Cir. 2014) (ordering reimbursement for an IEE); Warren G. ex rel. Tom G. v. Cumberland Cnty. Sch. Dist., 190 F.3d 80, 88 (3d Cir. 1999) (same); I.K. ex rel. E.K. v. Sylvan Union Sch. Dist., 681 F. Supp. 2d 1179, 1192 (E.D. Cal. 2010) ("Appropriate relief under the IDEA can include . . . reimbursement for the cost of services that a school wrongfully failed to provide."); D.L., 548 F. Supp. 2d at 823 (ordering reimbursement for an IEE even though there was no statutory right to an IEE).

/ / /

---

[3] Although the Court also found that District did assess Student through Gallagher in sensory integration, that assessment was provided for in the settlement agreement and was thus an IEE for which Student is not entitled to another.

As discussed above, Student's behaviors became progressively more aggressive and violent over time.  Although District acknowledged in the 2012 IEP that Student's behavioral plan was inadequate, it did not agree to fund an assessment to address the issue until after Parents gave unilateral notice of their intent to enroll Student at Beacon.  Nor did District initiate a due process hearing, as required by Cal. Educ. Code § 56329(c), following its denial of Parents' numerous requests for IEEs.  See Pajaro Valley Unified Sch. Dist. v. J.S., 2006 WL 3734289, at *3 (N.D. Cal. Dec. 15, 2006) (ordering reimbursement for an IEE because the school waited three months to file a due process complaint to show its assessment was adequate).  Therefore, the Court finds "that equitable concerns require [District] to be responsible for the funding of [Student's] IEE."  D.L., 548 F. Supp. 2d at 823.

### E.    Whether Student is Entitled to Reimbursement for Beacon

Since the ALJ did not make the predicate findings—namely, that Student was denied a FAPE—the ALJ ultimately held that Student is not entitled to a compensatory education.  More specifically, the ALJ found that District sufficiently assessed Student in Student's areas of need, that Student made academic progress at Cottonwood, and that Parents' absence from the July 2012 IEP addendum meeting did not result in the denial of a FAPE.  As previously discussed, District's purported assessments of Student's behavior and anxiety were not adequate and resulted in lost educational opportunity.  Further, District's conduct with respect to the July 2012 IEP addendum meeting seriously "infringe[d] [] [P]arents' opportunity to participate in the IEP formation process."  R.B., ex rel. F.B., 496 F.3d at 938.  Thus, Student was denied a FAPE on these bases.

When a student is denied a FAPE, "[t]here is no question that the district court ha[s] the power to order compensatory education."  Parents of Student W., 31 F.3d at 1496.  Indeed, it is "a rare case when compensatory education is not appropriate."  Id. at 1497.  Before awarding such relief, the court must "ensure that the student is appropriately educated within the meaning of the IDEA" in the new school.  Id.; Forest

Grove Sch. Dist. v. T.A., 557 U.S. 230, 247 (2009) ("we conclude that IDEA authorizes reimbursement for the cost of private special-education services when a school district fails to provide a FAPE and the private-school placement is appropriate"); Warren G. ex rel. Tom G., 190 F.3d at 84 ("the test for the parents' private placement is that it is appropriate, and not that it is perfect."); Daniel S., ex rel. Michael S. v. Council Rock Sch. Dist., 2007 WL 3120014, at *5 (E.D. Pa. Oct. 25, 2007).  Nonetheless, the Court must "consider all relevant factors, including the notice provided by the parents and the school district's opportunities for evaluating the child, in determining whether reimbursement for some or all of the cost of the child's private education is warranted." T.A., 557 U.S. at 247.

Having denied Student a FAPE by not assessing Student in her areas of need, as well as by impeding Parents' right to participate in the July 2012 IEP, District is bound to provide Student with a compensatory education.  Parents of Student W., 31 F.3d at 1496; see also, e.g., J.T. ex rel. Renee v. Dep't of Educ., 2012 WL 1995274, at *30 (D. Haw. May 31, 2012) (awarding a compensatory education because it is the most equitable method of compensation for lost educational opportunity).  Although Parents repeatedly asked for reassessments, District did not fund any.  Only after Parents gave unilateral notice of their intent to enroll Student at Beacon did District finally agree to a reassessment of Student's behavior.  District had ample opportunity to evaluate Student—it simply declined to do so.  Thus, considering all relevant factors, the Court finds that reimbursement is warranted.  T.A., 557 U.S. at 247.

As to Beacon's appropriateness for Student, Student's maladaptive behaviors notably decreased while attending the school, and, as Dr. Morris found, Student made academic progress there as well.  In any event, although the parties disagree as to the extent of Beacon's effect on Student, they do not ultimately dispute the fact that Student

/ / /

/ / /

/ / /

is "appropriately educated within the meaning of the IDEA" at Beacon.[4] <u>Parents of Student W.</u>, 31 F.3d at 1496. Accordingly, Student is entitled to reimbursement for her tuition.

## VII. CONCLUSION

For the foregoing reasons, the ALJ's judgment is **REVERSED**. District is **ORDERED** to reimburse Student, by and through her Guardian Ad Litem, for all reasonable and necessary costs incurred for Dr. Morris's services as well as for tuition at Beacon.

**IT IS SO ORDERED.**

Dated: July 24, 2015

CHRISTINA A. SNYDER
UNITED STATES DISTRICT JUDGE

---

[4] Although not raised before this Court, Greg Cleave, District's Program Specialist, testified at the administrative hearing that he thought Beacon was inappropriate for Student because Beacon lacks neurotypical peers and is far from Student's home. Cleave's first point lacks persuasive force, as Student had only limited interactions with neurotypical peers even at Cottonwood. The Court also fails to see how Beacon's location relative to Student's home has any bearing on whether she would be appropriately educated there.